THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| PAULA R. BABB, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| v. | : | **No. 5:06-cv-281 (CAR)** |
| | : | |
| METROPOLITAN LIFE | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

In this case, Plaintiff seeks to recover benefits from a long-term disability policy ("the Policy") provided as part of an employee welfare benefits plan ("the Plan") sponsored by her former employer, Geico Corporation, and administered and funded by Defendant Metropolitan  Life Insurance Company ("MetLife").   The case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  The parties have submitted motions for summary judgment on the limited issue of whether MetLife's decision to terminate payment of long-term disability benefits was wrong on *de novo* review.   Upon review of the claims file, the arguments of counsel, and the relevant legal authorities, the Court finds that MetLife's decision to terminate Plaintiff's benefits was wrong.  Accordingly, MetLife's Motion for Summary Judgment (Doc. 31) is hereby **DENIED** and Plaintiff's Motion for Summary Judgment (Doc.32) is hereby **GRANTED**. It remains to be determined whether MetLife's decision was arbitrary and capricious.

1

## BACKGROUND

On March 21, 2003, Plaintiff left her job as a manager of telephone claims adjusting for Geico, where she had been employed since 1979.  She claimed that she was no longer able to work due to chronic neck pain.  She was first treated for her neck pain in December of 1997, and underwent a cervical diskectomy and fusion in September 1998.  Although she continued to experience pain and seek regular treatment for her neck condition, she continued to work for GEICO for four and a half years after her surgery.

On August 7, 2003, her attorney submitted to MetLife a claim for long term disability benefits under the Plan.  MetLife approved the request for benefits by letter dated September 18, 2003 (CL 0141) and continued to pay benefits until June 1, 2005, when MetLife terminated her claim.  MetLife's letter to Plaintiff regarding the approval of her claim sets forth the Plan's definition of a covered long-term disability:

> Disability or Disabled means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:
> 1. you are unable to perform each of the material duties of your regular occupation; and
> 2. after the first 24 months of benefit payments (9/17/05), you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings.

2

CL 0141.[1]  The letter states that MetLife would require periodic medical certification of Plaintiff's claim and that benefits would cease should Plaintiff cease to be disabled.

MetLife's September 18, 2003 letter further directs Plaintiff to apply for Social Security disability benefits as soon as possible and notifies her that an award of Social Security benefits would reduce the amount of benefits paid by the Plan.  Plaintiff would be required to reimburse the Plan for any overpayment of benefits resulting from a retroactive award of benefits by the Social Security Administration.  Plaintiff's application for Social Security benefits was initially denied on January 23, 2004.  CL 0220.  After Plaintiff notified MetLife of the denial, MetLife referred her to an attorney in Alabama to assist with an appeal of the decision.  CL 0220.  The appeal was ultimately successful, as an Administrative Law Judge (ALJ) issued an opinion on November 23, 2005, granting Plaintiff full benefits retroactive to March 21, 2003.  CL 0007-0011.[2]

Before the ALJ issued her opinion, however, MetLife had already terminated Plaintiff's benefits under the Plan.  In its May 25, 2005 letter notifying Plaintiff of the decision to terminate her benefits, MetLife explains the reason for its change of course:

> MetLife has reviewed all the documentation contained on your claim including documentation from you, your employer and Dr. Gerald Brantley.
>
> Dr. Brantley documented that you are diagnosed with Cervical Radiculopathy, Failed Back Syndrome and Migraine Headaches.

---

[1] The claims file upon which MetLife based its decision is found in the record as Exhibits 5-7 to MetLife's Motion for Summary Judgment (Doc. 31).  References to the claims file in this opinion are by the Bates stamp number of the documents as they are found in the file.

[2] MetLife contends that any continued benefits to Plaintiff should be offset by the disability payments received from the Social Security Administration.  The question of overpayment is not before the Court on the present motion and the Court makes no finding as to Plaintiff's responsibility under the terms of the Plan to reimburse MetLife for any overpayments.

MetLife reviewed the following office notes submitted by Dr. Brantley, dated 3/11/2005, 11/30/2004 and 10/25/2004.  The documentation shows that you had complaints of migraine headaches and an achy, chronic neck pain and arm pain.  You reported that you have difficulty opening jars, dropping objects all the time and that your writing is variable.  You also reported that you take a variety of medications and some of the medications cause you to have mental effects.

A Functional Capacity Evaluation done in April 2003 indicated that there was no evidence of cervical spine radiculopathy or corticospinal tract impairment.  No Electromyelogram or Nerve Conduction Studies have been provided.

In summary, the submitted documentation does not provide a measure of your functionality that supports your inability to perform your job as a manager.  Therefore, your claim has been withdrawn effective June 1, 2005.  No further benefits are payable and your claim has been closed.

CL 0061.  In short, MetLife relies upon the findings of a Functional Capacity Examination conducted shortly after Plaintiff left work to discount Plaintiff's complaints and the diagnosis of her treating physician.  The letter notifies Plaintiff of her opportunity to file an appeal and submit additional materials.

Plaintiff filed an appeal, including additional materials such as new physician reports, but that appeal was rejected on the recommendation of MetLife's consultant, Dr. Patrick Parcells, a neurologist, who reviewed Plaintiff's claim file on October 14, 2005.  CL 0023.  Plaintiff was notified of the denial of her appeal by letter dated October 26, 2005.   In its October 26 letter, MetLife outlines its reasons for denying the appeal in greater detail than it provided in its May 25 letter announcing the termination of benefits:

4

The available medical documentation on file includes diagnoses of chronic neck pain post cervical fusion, post surgical changes of solid appearing fusion, degenerative disc disease with mild broad-based protrusion, brachial neuritis, radiculitis and shoulder impingement tendinitis.  The determination of disability or continued disability is not based upon the presence of diagnoses but on functional ability supported by recent objective clinical evidence that would substantiate current symptoms consistent with those reported by the patient and medical providers.

On October 14, 2005 the entire claim file was carefully reviewed by an independent board-certified physician who specializes in Neurology.  Review of records notes a history of neck pain with sudden onset in November 1997.  A diagnosis of right carpal tunnel syndrome was noted in January 1998 by EMG.  A CT myelography in September 1998 demonstrated disc protrusions with a focal amputation of the right C6 root sheath.  An anterior cervical disc fusion was performed on September 24, 1998 with good improvement of the neck and right arm pain.  An MRI of December 1998 showed mild cord flattening at C4/5, early osteophyte and disc bulges at C4/7 [*sic*].  A bone scan showed a pseudoarthritis at C5/6, and repeat EMG showed right carpal tunnel syndrome.  Subsequent x-rays showed a solid fusion.  Repeat EMG on July 1, 1999 demonstrated a moderately severe right carpal tunnel syndrome with no evidence of a cervical radiculopathy.  Ms. Babb underwent right carpal tunnel release in August 1999.

Subsequent records refer to pharmacological treatment with multiple medications including oxycontin, neurontin, ultram, celebrex, robaxin, wellbutrin and buspar, along with trigger point and botox injections.  More recent information refers to the addition of voltran for breakthrough pain and physical therapy.  Office notes and physical examination findings do not support the existence of any focal neurological impairments.  The records include a functional capacity evaluation of April 3, 2003, during which Ms. Babb demonstrated a six hour per day work capacity with the

ability to change postures as needed, no overhead work, far right or left head turning, and no repetitive downward looking.

More recent medical records from 2005 refer to epidural steroid injections by Dr. Shields on May 10, 2005 and May 26, 2005.  A June 22, 2005 note [from] Houston Orthopaedic Surgery and Sports medicine documents a complaint of chronic neck pain and a previous history of cervical fusion. The musculoskeletal examination revealed normal strength in the upper extremities with exception of 4/5 strength in bilateral supraspinatus and external rotators, positive impingement in left greater than right shoulder, positive Spurling's maneuver that radiates pain to spinous process.  Physical therapy was recommended.  On the next visit of July 6, 2005 Ms. Babb reported doing a little bit better and would be referred to pain management. A follow-up note from Houston Orthopaedic that is undated noted on physical examination normal gait, no balance disturbance, normal range of motion, back was non-tender to palpation, no muscle atrophy, no back instability, tenderness in the paraspinal and rhomboid areas, no tenderness in the trapezius, flexion at 50%, painful left and right lateral bending/rotation, no instability of the neck, no tenderness of the shoulders, negative Spurling's, no shoulder impingement, full range of motion of the shoulders, and supraspinatus testing was negative.  Neurological examination showed diminished sensation at the radial forearm, motor strength at 4+/5, and deep tendon reflexes were symmetrical.  There was lengthy discussion about a CT myelogram, though Ms. Babb stated that she was not interested in any surgical intervention.

The independent reviewer concluded that the available medical documentation does not substantiate functional impairment that would preclude a sedentary capacity consistent with her own sedentary occupation as of June 1, 2005 and ongoing.  There is no objectively documented neurological abnormality in terms of upper extremity motor weakness, reflex changes or sensory changes.  She underwent carpal tunnel release surgery which would have corrected the right carpal tunnel syndrome.  The

functional capacity evaluation did demonstrate a six hour capacity, however, given appropriate work adjustment in terms of the usual time allotments for breaks as well as postures and materials, Ms. Babb would have functional capacity for full-time sedentary occupational functioning.

Therefore, the determination to withdraw was appropriate and remains in effect.

CL 0023-0024.   After the ALJ awarded Plaintiff Social Security benefits in November 2005, Plaintiff's counsel telephoned MetLife's case manager to request a reconsideration of its decision. MetLife refused.   Subsequently, Plaintiff filed the present lawsuit pursuant to Section 502(a) of ERISA.   29 U.S.C. § 1132(a).

## *DE NOVO* REVIEW

The parties have submitted this case to the Court for a summary judgment decision on the limited issue of whether MetLife's decision to discontinue benefits was wrong from a *de novo* point of view.[3]   "A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, the court disagrees with the administrator's decision."   Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).   In other words, the court must "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously."   Stiltz v. Metropolitan Life Ins. Co., No. 1:05-cv-3052-TWT, 2006 WL 2534406, at *6 (N.D.Ga. Aug. 30, 2006), aff'd 244 Fed. App'x.

---

[3]*De novo* review is only the first step in the analysis under the "arbitrary and capricious" standard of review that courts apply when an ERISA plan gives the plan fiduciary or administrator discretion to determine eligibility for benefits.   It is undisputed that the Geico Plan in this case gave MetLife such discretion.   Because this Order grants Plaintiff's motion and finds that MetLife's decision was wrong, it remains to be decided whether its decision was arbitrary and capricious.   Recent decisions have changed the arbitrary and capricious analysis as it applies to administrators – such as MetLife – who have a conflict of interest.   See Doyle v. Liberty Life Ins. Co. of Boston, ___ F.3d ___, 2008 WL 4272748 (11th Cir., Sept. 18, 2008); Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S.Ct. 2343 (2008).

260 (11th Cir. 2007).  Particularly in cases such as this one, dealing with spinal degeneration and resulting back or neck pain, *de novo* review presents the unenviable task of weighing and evaluating various medical reports and records along with the plaintiff's own inherently subjective representations of pain, to determine whether such pain limits the ability to work.

Standing in the shoes of the administrator, the Court concludes that MetLife had scant reason to discount Plaintiff's claim that she is unable to perform the duties of her prior, sedentary occupation, given the state of the record upon which it based its decision.  Plaintiff's claim is supported by substantial evidence, including her objective medical condition, her own representations as to her pain and limitations, and the opinions of doctors who have personally examined her.  MetLife's record shows that Plaintiff has a history of neck pain resulting from spinal degeneration dating back to 1997.  There are reports from MRI examinations that show the objective condition of Plaintiff's cervical spine.  In support of her initial claim and at the request of MetLife on several subsequent occasions, Plaintiff submitted Attending Physician Statements from her primary doctor, Dr. Gerald Brantley, a doctor of internal medicine.  Dr. Brantley diagnoses Plaintiff with cervical radiculopathy and failed neck syndrome, and states his opinion that Plaintiff is unable to work more than 2-3 hours per day because of pain and the effects of her pain medication.  With her appeal, Plaintiff presented the report of a specialist, Dr. Daxes Banit of Houston Orthopaedic and Surgery and Sports Medicine, who performed an examination of Plaintiff and determined that her pain and the effects of her medication would prohibit gainful employment.

This evidence in favor of Plaintiff's claim significantly outweighs the evidence in the administrative record that supports MetLife's decision to discontinue benefits.  In its letter announcing the discontinuation of Plaintiff's benefits, MetLife relies primarily on a single

Functional Capacity Evaluation ("FCE") performed on April 5, 2003. MetLife contends that the FCE shows that Plaintiff was capable of performing her job at GEICO despite her condition. Its interpretation of the FCE is questionable, however, in that the FCE is ambiguous and does not in fact state that Plaintiff was capable of performing her job. In response to Plaintiff's appeal, MetLife also relies on the Independent Medical Review of Dr. Patrick Parcells. Dr. Parcells did not personally examine or treat Plaintiff, but merely reviewed her medical records. Like MetLife in its initial denial, Dr. Parcells overemphasizes and overinterprets the FCE and completely discounts the findings of Plaintiff's doctors. MetLife never requested an Independent Medical Examination of Plaintiff. There are no records in MetLife's file from any doctors who actually examined or treated Plaintiff and found that she was able to work

The beginning of any *de novo* analysis of a disability claim is a review of the objective medical findings. In this case, there are radiological records dating to 1998 that establish as a baseline that Plaintiff did experience an observable, physical degeneration in her cervical spine. Plaintiff first sought treatment for her neck pain in December 1997. A radiologist's review of X-ray tests on May 22, 1998, describes mild, multilevel degenerative disc disease at C4/5 through C6/7, with small anterior marginal osteophytes and reversal of cervical lordosis at the C4/5 level. CL 0170. The report from a September 3, 1998 cervical myelography describes disc protrusions at C4/5 through C6/7, most marked at C5/6, with focal amputation of the right C6 root sheath. CL 0172. On September 24, 1998, Plaintiff went into surgery for a cervical diskectomy and fusion of the C5/6 level. CL 0174. Following the surgery, Plaintiff still complained of neck pain, and a December 11, 1998 MRI report describes "early osteophyte and disc bulges" at C4/5 and C6/7, with "mild cord flattening" at C4/5. CL 0178. There is no indication that Plaintiff's spinal condition improved

between the time of her disk fusion surgery in 1998 and the time she finally left work in 2003.  An MRI report from May 5, 2005, describes an impression of degenerative disc disease at the C4/5 and C6/7 levels, with mild, broad-based disc protrusion contributing to a mild degree of central spinal stenosis at both levels.  CL 0043.

Although the essentially objective results of the radiological testing reveal that Plaintiff had a real, physical degeneration of her spine, the degree to which that degeneration disabled her from working requires some subjective input.  With her initial claim, Plaintiff submitted a personal profile in which she describes in detail her experience with her spinal condition.  When asked to provide a brief description of her condition, she writes:

> I experience pain in upper body, spasms, constrictions.  Pain meds required to function physically alter my mental capabilities.  I can complete the same technical tasks but it takes me much longer.  Therefore my physical condition can't tolerate the hrs necessary to complete my job responsibilities.  I can't tolerate the pain without meds and the meds limit my mental abilities.

CL 0187, 0193.  She states that her daily routine on "high pain days" generally is limited to sleeping and watching TV, but on "good days" she is able to do the wash and errands.  CL 0188.  She states that she is able to take care of her personal hygiene with difficulty, as pain and spasms make it difficult to control her hands.  Id.  She describes difficulty with cooking and shopping and states that she is no longer able to keep up with housework and that her "once very organized, clean, kept house is in disarray."  CL 0190.  She also describes difficulty driving or riding in a car because of pain from the vibrations and the effects of her medications.  Id.  She states that she is unable to maintain any hobbies or activities except church attendance.  CL 0190, 0196.  When asked if she feels she could return to her job with accommodations, she writes:

> I am having a difficult time giving into the pain forfeiting my position/career.  I love my job and pushed for yrs to continue at a functional level.  I accommodated my lifestyle in any way possible.  Unfortunately, I have destroyed my physical, mental health in order to function.  The commute, the computer work, writing, meetings, reports, etc. are necessary for my job responsibilities but aside from that I just cannot physically tolerate the hrs now required because of the effects of pain medication.

CL 0189, 0195.

In disability insurance coverage cases under ERISA, particularly in cases involving back or neck injuries such as Plaintiff's, subjective representations of pain and limitations present unique challenges to courts.  As insurers are inclined to imply (without ever quite stating it), there is always the possibility of malingering or exaggerating effects.   It is impossible to measure or quantify the point at which pain becomes debilitating.  Thus the Court must view subjective representations with a degree of skepticism, but cannot ignore or discount them.  As the Eleventh Circuit has recently observed:

> much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured.  Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence that [defendants] characterize as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms.

Oliver v. Coca Cola Co., 497 F.3d 1181, 1196 (11th Cir. 2007), vacated in part, on other grounds, 506 F.3d 1316 (2007).  A plaintiff's subjective reports of pain, therefore, should be considered in light of any objective physical findings that are available and other indications of credibility.  Unfortunately, the ERISA procedure does not countenance a hearing such as that conducted by the ALJ in the Social Security case, in which Plaintiff's testimony was found to be "generally credible

11

in light of the objective medical evidence and longitudinal treatment record from treating and examining sources, and the claimant's consistent work history."  CL 0009.

Although the Court cannot make credibility determinations based on Plaintiff's demeanor and appearance on the witness stand, it does find that the same indicia of reliability cited by the ALJ lend credibility to the representations in Plaintiff's personal profile.  Foremost among these is Plaintiff's "consistent work history."  Plaintiff worked for GEICO for twenty-four years.  It is notable to the Court that Plaintiff persisted in her job with GEICO for more than five years after she first sought treatment for her neck pain and for four and a half years after her fusion surgery.  The records show that Plaintiff continued to seek treatment for her pain after her surgery.  Her persistence in her work in spite of this pain lends weight to her personal statement that she was determined to continue working and only quit when it became impossible to tolerate the pain and function in her job.  This persistence belies any suggestion of malingering or exaggeration of symptoms.

As the ALJ noted, Plaintiff's credibility is further supported by the medical records from treating and examining physicians.  There are several Attending Physician Statements from Plaintiff's primary doctor, Dr. Brantley, each of which affirms that Plaintiff's neck condition makes her unable to work.  In one representative statement, provided on March 11, 2005, Dr. Brantley states his primary diagnosis of cervical radiculopathy and failed neck syndrome, with a secondary diagnosis of migraine headaches and ADHD.  CL 0068.  With regard to Plaintiff's physical capabilities, he notes that she is unable to climb, twist, bend, stoop, reach above shoulder level, and operate a motor vehicle.  He further states his opinion that Plaintiff can work only two to three hours per day, interrupted, as a result of her pain and the mental effects of medication.  CL 0069.

The opinions of a treating physician must be weighed and considered just as the Plaintiff's subjective reports of her own pain must be considered.  Nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).  The treating physician's particular role gives at the same time both a degree of reliability to his opinion and a degree of unreliability.  On one hand, the treating physician has the closest and most regular contact with the patient, and thus is best positioned to observe the patient's symptoms over time.  On the other hand, the treating physician may develop a close relationship with the patient and be influenced, consciously or subconsciously, by sympathy for the patient or identification with the patient's interests.  As such, the Court weighs the opinions of Dr. Brantley for their reliability.

For several reasons, Dr. Brantley's findings in his Attending Physician Statements are of limited value.  First, Dr. Brantley is not a specialist in neurology or orthopaedics, but is a doctor of internal medicine.  Second, his Statements do not give detailed reports of the basis for his opinions. For example, MetLife quibbles with Dr. Brantley's diagnosis of cervical radiculopathy, as he provides no report of the basis for the diagnosis, and there are no reports of nerve conduction tests, EKGs, neurological exams, or other tests that would support or confirm his diagnosis.  It appears that his findings are based to some extent on physical examinations, but also to some extent on Plaintiff's own reports about her condition.  To the extent that a treating physician relies upon a patient's subjective complaints of pain, the administrator need not give special deference to the complaints "simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional."  Giertz-Richardson v. Hartford Life and Acc. Ins. Co., 536

13

F.Supp.2d 1280, 1292 (quoting Hufford v. Harris Corp., 322 F.Supp.2d 1345, 1356 (M.D.Fla. 2004)).  Nevertheless, Dr. Brantley's opinion cannot simply be ignored, without a reasonable basis to do so.  It does add the weight of a physician's observations and opinions to the statements offered by Plaintiff in her personal profile.

In addition to the Statements of Dr. Brantley there are records from Plaintiff's visits to the specialists at Houston Orthopaedic Surgery and Sports Medicine that add further support to Plaintiff's claim of disability.  Plaintiff visited Dr. K. Scott Malone on June 22, 2005 and Dr. Daxes Banit on July 15, 2005.   Dr. Malone reviewed Plaintiff's MRI reports and conducted a musculoskeletal examination.  His examination revealed that Plaintiff had a limited range of motion in her neck.  He also observed

> positive impingement in left greater than right shoulder with forward flexion and internal rotation of the shoulder.  She had a positive Spurling's maneuver that radiates pain to approximately C6/7 spinous process.  Sensation to pin prick was patchy in the upper extremity.  She had point tenderness to palpation along the upper and middle trapezius muscles bilaterally.

CL 0055.  Based on this examination, Dr. Malone diagnosed Plaintiff with Chronic Neck Pain Status Post Cervical Fusion, Left Shoulder Impingement Tendinitis, and Right Shoulder Impingement Tendinitis.  When Plaintiff returned for a follow-up visit on July 6, 2005, Dr. Malone noted that she reported her shoulder was doing a bit better but that she continued to experience neck pain rated at "8-9 out of 10."  CL 0056.

Plaintiff was seen by Dr. Banit approximately a week later.  Dr. Banit reviewed her radiological films and observed "significant spurring of the disc spaces above her previous 5/6 ACDF at the 4/5 and 6/7 levels" along with "some evidence for foraminal narrowing."  CL 0059.  He also took Plaintiff's history and conducted a physical and neurological examination.   After his

14

examination and review of the films, he concluded that Plaintiff "does have significant degenerative disc disease of the cervical spine and neck pain and the amount of medications that would prohibit any gainful employment."  CL 0060.  Because Dr. Banit is a specialist and because there is no indication that he might have an established relationship with Plaintiff that could influence his findings, his diagnosis and opinion is entitled to a greater weight than that of Dr. Brantley, with whom he essentially agrees.  Together with Dr. Brantley's Attending Physician Statements, the report of Dr. Banit confirms Plaintiff's representation that her pain makes her unable to work full-time in her previous, sedentary position.[4]

There is little evidence in the administrative record to contradict Plaintiff's representations of disability and the opinions of Dr. Brantley, Dr. Malone, and Dr. Banit.  In denying Plaintiff's claim, MetLife relied primarily on a single FCE conducted on April 5, 2003, by physical therapist Kenneth Blankenship.  This FCE, however, does not support MetLife's contention that Plaintiff is

_____

[4]The record indicates that Plaintiff was examined by another doctor at the request of the Social Security Administration.  The ALJ's opinion states that Plaintiff by Dr. Jeffrey Fried on November 13, 2003:

> On November 13, 2003, a consultative physical examination was performed by Dr. Jeffrey Fried.  Dr. Fried noted that x-rays showed degenerative disc disease with disc space narrowing at C6-7 and assessed the claimant with cervical radiculopathy.  He also reported she had decreased range of motion in her neck, back and shoulders and assessed her with cervical radiculopathy.  Dr. Fried stated that she would have difficulty with activities that involved rotation of the neck; that she should avoid driving, vibrations, and dangerous machinery; that she would have difficulty with lifting anything over ten pounds and with any reaching overhead activities; that her medications would definitely interfere with alertness and the ability to perform mental tasks, and cause fatigue; that she would need to change positions frequently; that she would be slow in performing work with her hands; and that the claimant's migraine headaches would interfere with ability to perform work.

CL 0008.  Dr. Fried's findings essentially agree with the findings of Dr. Brantley and would be highly persuasive, given that Dr. Fried is an independent specialist with no connection to Plaintiff or interest in the outcome of her case.  Unfortunately, there is no indication that MetLife ever received a copy of Dr. Fried's report.  The Court cannot find it in the record of the case, although it is referenced in the September 21, 2005 letter from Plaintiff's counsel notifying MetLife of her appeal.  CL 0039.  Because it was not a part of the administrative record at the time MetLife discontinued coverage and denied Plaintiff's appeal, it cannot be considered on *de novo* review of MetLife's decision.

able to do her sedentary job at GEICO.  To the contrary, Blankenship finds that Plaintiff "does not appear qualified to work a Sedentary job for the number of hours she reported she is working, 10 hours a day."  Instead he concludes that she is able to work at most 6 hours per day, and that finding is qualified in a number of ways.  Indeed, MetLife itself initially determined that Blankenship's report confirmed Plaintiff's claim of disability, with the following note appearing in MetLife's diary review report for September 11, 2003:

> *4/5/03 Functional Capacity confirms EE's ability to perform a sedentary job but unable to work more than 6 hrs per day.  EE has decreased ROM to neck or ability to look downward/upward @ work.  EE requires frequent postural changes + frequent changes in work tasks she is performing.
>
> ** Assessment: FCE confirms EE's physical limitations + inability to work > 6 hrs per day @ a sedentary job.

CL 0216.  Based on this reading of the FCE, MetLife decided to approve Plaintiff's claim for benefits.

The FCE upon which MetLife based its decision to terminate Plaintiff's benefits is of limited value even for the proposition that Plaintiff is capable of working six hours per day, given the findings of the therapist.  Blankenship reports that he reviewed Plaintiff's medical records and spoke with her prior to administering his tests.  He writes that Plaintiff reported to him that she continued to experience pain after her fusion surgery, and that treatments such as trigger point injections, Botox injections, and pain medications provide only temporary relief.  CL 0160.  She explained to him

> that when she works on a computer for 1-2 hours, she has a lot of spasms in her Neck and posterior Shoulders, and she has to take more pain medication to function.  In

16

short, she says that she feels like she is "wearing herself out" trying to work and maintain a normal home life with all of her pain.[5]

Id. Blankenship's observations as to involuntary muscle spasms and guarding/range of motion are consistent with Plaintiff's representations as to her pain:

> There is mild involuntary muscle guarding in the Cervical Spine and a mild to moderate decrease in range of motion in all active Neck movements, actively, and this appears to be secondary to organic pain.  This assessment appears to be consistent with Ms. Babb's reports of positional pain with long term Computer work and other tasks, such as carrying notebooks and her briefcase.

CL 0161.  Although Blankenship's neurological examination revealed no "hard clinical signs" of a cervical radiculopathy, he notes that his findings as to "ongoing radiculopathy" are "Questionable by Subjective Shoulder and Arm Pain."  CL 0162, 0163.  In testing her repetitive and static work ability, Blankenship observes that Plaintiff is not qualified to perform in overhead reaching, critical balancing, arm controls, or fine hand activities.  CL 0164.  He sums up his functional assessment by reporting that Plaintiff's ability to work is hindered by a number of limitations:

> A functional assessment was performed on Ms. Babb, however, it is very difficult to test a person who works a Sedentary job because most of the functional tests are geared towards those who work jobs with higher strength demands, therefore some assumptions must be made.  Based on her actual test results, Ms. Babb **does not appear qualified to work a Sedentary job for the number of hours she reported that she is working, 10 hours a day**.  She is not qualified to remain in static Head, Neck, and Shoulder postures for more than 20-45 minutes continuously, and she is not qualified to turn her Head and Neck to the ends of her active range of motion or to look downward or to look upward to work overhead.  Frequent postural changes and frequent changes in the work tasks she is performing are also necessary.

---

[5]The FCE was conducted just two weeks after Plaintiff left work, at which time she was still considering a return to work.

CL 0163 (emphasis added).

Blankenship's findings are not inconsistent with Plaintiff's subjective representations or with the opinions of her doctors.  Although MetLife makes much of the fact that Blankenship's neurological examination revealed no hard clinical signs of radiculopathy, Blankenship himself leaves open the possibility of such a diagnosis based on Plaintiff's subjective pain experience. Nothing in his report gives any reason to question Plaintiff's subjective report of pain; to the contrary, he finds that her involuntary muscle guarding and decreased range of motion in all active neck movements is consistent with her reports of pain.

The Court finds that the opinion of Dr. Parcells, the independent medical consultant hired by MetLife to review Plaintiff's records, is not entitled to any significant weight, in that it does little more than parrot the position of MetLife in its first denial of benefits.  As MetLife argues, "It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports **rebut** the opinion of the treating physicians asserting claimant is disabled."   Hufford v. Harris Corp., 322 F.Supp.2d 1345, 1359 (M.D.Fla. 2004) (emphasis added).  Nevertheless, the consultant must actually rebut the treating physician's opinion, not simply reject it.  There is no more a presumption in favor of a consultant's opinion than there is in favor of the treating physician's opinion.  Just as a treating physician may have interests that influence his opinion in favor of the claimant, a consultant may have interests that influence his opinion in favor of the insurer.[6]  Moreover, the value of the consultant's opinion is

---

[6]The Seventh Circuit thoughtfully examines the competing interests of treating physicians and consultants in the following passage from Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 917 (2003):

A number of social security disability cases apply a "treating-physician presumption," e.g., Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir.2000); Shramek v. Apfel, 226 F.3d 809, 814 (7th Cir.2000); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.2000); see also 20 C.F.R. § 404.1527(d)(2),

reduced by the fact that the consultant has not had the opportunity to see or examine the claimant. Accordingly, on *de novo* review, it is appropriate for the Court to scrutinize a consultant's opinion to determine whether it gives the plan administrator reasonable and credible grounds for discounting the opinions of treating physicians.

Dr. Parcells' report fails to rebut the conclusions reached by Dr. Brantley, Dr. Malone, and Dr. Banit. These doctors concluded, based on their personal examinations of Plaintiff and their reading of her radiological reports, that Plaintiff was not lying about her pain and that the degenerative condition of her cervical spine caused her chronic, severe pain that made her unable to work. Plaintiff's pain was also observed by the physical therapist, Blankenship, during Plaintiff's FCE. Parcells simply avoids the question of pain and focuses on the lack of indications of neurological abnormality. After a lengthy summary of Plaintiff's treatment history, Parcells states his conclusions in three paragraphs:

> Ms. Babb's current level of functionality as documented by the functional capacity
> evaluation was that she would be capable of a six-hour work capacity with the ability

---

though there are grounds for skepticism; physicians naturally tend to support their patients' disability claims, and so we have warned against "the biases that a treating physician may bring to the disability evaluation," Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir.2001), explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir.1985); see also Brown v. Apfel, 192 F.3d 492, 500 (5th Cir.1999). But such skepticism may have a stronger basis when the treating physician squares off against a neutral consultant appointed by the Social Security Administration than when the consultant is hired by the administrator of a private plan and so may have a financial incentive to be hard-nosed in his claims evaluation in order to protect the financial integrity of the plan and of the employer that funds it. Ladd v. ITT Corp., 148 F.3d 753, 754 (7th Cir.1998); Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1052-53 (7th Cir.1987). If the incentives of the treating physician and of the plan's consultant are assumed to be equal and opposite, consideration of incentives drops out and the superior information likely to be possessed by the treating physician, especially when as in this case the consultant does not bother to examine the patient, may support the treating-physician presumption after all. See Bali v. Blue Cross & Blue Shield Ass'n, 873 F.2d 1043, 1048 (7th Cir.1989); cf. Whitson v. Finch, 437 F.2d 728, 732 (6th Cir.1971).

to change postures as needed with no overhead work, no far right or left head turning, and no repetitive downward looking. However, from a neurological perspective, documentation of significant neurological abnormality **other than neck pain and neck discomfort** was not noted that would preclude her from functioning at a full-time sedentary position.

The available medical documentation does not substantiate functional impairment that would preclude a sedentary capacity consistent with this individual's own sedentary occupation as of 06/01/05 and ongoing for the reasons stated above. This reviewer concludes that there is no objective documented neurological abnormality in terms of upper extremity motor weakness, reflex changes, or sensory changes. ... She underwent a functional capacity evaluation. She would need the ability to change postures as needed. It was felt that no overhead working, no far right or left head turning, and no repetitive downward looking would be appropriate. The FCE noted a six-hour work capacity.

However, given appropriate work adjustment in terms of the usual time allotments for breaks, as well as postures and materials to prevent the activities listed above, from a neurological perspective, Ms. Babb would have function capacity for full-time sedentary work as of 06/01/05 and ongoing.

CL 0030 (emphasis added). The highlighted portion of Dr. Parcells' report is noteworthy. He appears to concede that Plaintiff may be suffering from the neck pain she describes. He offers no medical basis to conclude that she is exaggerating her pain. He argues only that she has no disability based on neurological abnormalities such as motor weakness, reflex changes, or sensory changes. After ignoring Plaintiff's subjective representations of pain, confirmed by the observations of her treating physicians and of the physical therapist, Dr. Parcell's goes on to ignore even the results of the FCE that MetLife relies on. The FCE concluded that Plaintiff would be able to work in a

20

sedentary capacity "no more than 6 hours a day," and then only with significant limitations and accommodations such as avoiding static postures for more than 30-45 minutes and allowing frequent postural changes and frequent changes in work tasks.  CL 0163.  Dr. Parcells gives no medical or other reason for rejecting the FCE's conclusions and stating that Plaintiff would be able to work full time.

The strong weight of the evidence in MetLife's administrative record supports Plaintiff's claim that she is unable to perform the material duties of her regular occupation.  Her claim of severe, debilitating neck pain is consistent with her objective physical condition.  Any suggestion of malingering or exaggeration is belied by her history of continuing to work for five years after she began experiencing pain.  Her claim is affirmed by the opinions of her regular, treating physician and by the observations of two specialists who examined her.  It is also affirmed by the report of the FCE, which notes that Plaintiff's responses were consistent with her reports of pain.  Dr. Parcells' report does nothing to challenge these observations, and appears to be nothing more than a rubber-stamp of MetLife's previous decision to discontinue benefits.  Standing in the shoes of the administrator, therefore, the Court concludes that MetLife's decision to discontinue coverage under the "own occupation" provisions of the Plan was wrong.

**SO ORDERED**, this 25th day of September, 2008.


S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT COURT

chw

21